## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

KRISTEN MEGHAN KELLY,

      Plaintiff,

vs.

THE DAILY BEAST COMPANY LLC, LARRISON CAMPBELL, AND THE AMERICAN INDUSTRIAL HYGIENE ASSOCIATION,

      Defendants.

_____/

Case No. 1:22-cv-00482

Hon. Hala Y. Jarbou

**ORAL ARGUMENT REQUESTED**

## DEFENDANTS THE DAILY BEAST COMPANY LLC
## AND LARRISON CAMPBELL'S MOTION TO DISMISS
## ORAL ARGUMENT REQUESTED

Defendants The Daily Beast Company LLC[1] and Larrison Campbell (together "The Daily Beast"), by and through their counsel Honigman LLP, hereby move this Court pursuant to Fed. R. Civ. P. 12(b)(6) for an order dismissing Plaintiff's Complaint in its entirety and with prejudice.

Pursuant to L.R. 7.1(d), on June 6, 2022, counsel for The Daily Beast contacted Plaintiff's counsel requesting concurrence in the relief sought in this motion and concurrence has not been reached.

---

[1] Plaintiff sued "The Daily Beast Company, LLC," inserting a comma into the entity name.  The entity name does not have a comma.  In this Motion and Brief and in any and all future filings with this Court, The Daily Beast shall refer to the entity by its proper name, without the comma.

44135142.3

Respectfully submitted,

HONIGMAN LLP
*Attorneys for Defendants The Daily Beast Company*
*LLC and Larrison Campbell*

By: */s/ Andrew M. Pauwels*
J. Michael Huget (P39150)
Leonard M. Niehoff (P36695)
Andrew M. Pauwels (P79167)
Honigman LLP
315 East Eisenhower Parkway Suite 100
Ann Arbor, MI 48108-3330
(734) 418-4254
mhuget@honigman.com
lniehoff@honigman.com
apauwels@honigman.com

Dated: June 7, 2022

44135142.3

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

KRISTEN MEGHAN KELLY,

        Plaintiff,

vs.

THE DAILY BEAST COMPANY LLC, LARRISON
CAMPBELL, AND THE AMERICAN INDUSTRIAL
HYGIENE ASSOCIATION,

        Defendants.

_____/

Case No. 1:22-cv-00482

Hon. Hala Y. Jarbou

**ORAL ARGUMENT REQUESTED**

**BRIEF IN SUPPORT OF DEFENDANTS THE DAILY BEAST COMPANY LLC**
**AND LARRISON CAMPBELL'S MOTION TO DISMISS**
**ORAL ARGUMENT REQUESTED**

44135142.3

# TABLE OF CONTENTS

INDEX OF AUTHORITIES..........................................................................................ii

I.  INTRODUCTION ...........................................................................................1

II.  STATEMENT OF FACTS ..............................................................................1

III.  ARGUMENT ..................................................................................................6

  A.  Courts Have Recognized That Early Dismissal of Claims Like These Provides Important First Amendment Protection. ...................................8

  B.  The Plaintiff Must Plead a Plausible Claim.............................................9

  C.  The Daily Beast Did Not Even Publish Some of the Statements of Which the Plaintiff Complains. ...........................................................................9

  D.  All of the Statements of Which Kelly Complains Are Constitutionally Protected Opinions, Rhetorical Hyperbole, or Figurative Language.....................10

  E.  Kelly Has No Claim Because the Gist of the Article is True. ...............15

  F.  Kelly Has Not Adequately Pled Actual Malice and Cannot Do So.......................16

  G.  Kelly's Intentional Infliction of Emotional Distress Claim Is Subject to Dismissal..........................................................................................21

IV.  CONCLUSION..............................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ..................................................................................9, 18, 20

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 555 (2007) ..................................................................................9, 18, 20

*Bose Corp. v. Consumers Union of U.S., Inc.,*
    466 U.S. 485 (1984) ..........................................................................................19

*Cera v. Gannett Co.,*
    47 A.D.2d 797 (N.Y. Sup. Ct. App. Div. 4th Dep't 1975) ....................................17

*Dannis v. C & G Publ'g, Inc.,*
    468 N.W.2d 331 (Mich. Ct. App. 1991) ..............................................................20

*Edwards v. Detroit News, Inc,*
    910 N.W.2d 394 (Mich. Ct. App. 2017) ...............................................6, 11, 12, 20

*Gaynes v. Allen,*
    339 N.W.2d 678 (Mich. Ct. App. 1983) ..............................................................18

*Gertz v. Robert Welch, Inc.,*
    418 U.S. 323 (1974) ................................................................................16, 17, 18

*Greenbelt Cooperative Publ'g Ass'n v. Bresler,*
    398 U.S. 6 (1970) .............................................................................................10

*Herbert v. Lando,*
    781 F.2d 298 (2d Cir. 1986) ..............................................................................19

*Hustler Magazine, Inc. v. Falwell,*
    485 U.S. 46 (1985) ...........................................................................................21

*Ireland v. Edwards,*
    584 N.W.2d 632 (Mich. Ct. App. 1998) ................................................8, 10, 13, 19

*Kevorkian v. American Medical Ass'n,*
    602 N.W.2d 233 (Mich. Ct. App. 1999) ................................................................8

*Lakeshore Cmty. Hosp., Inc v. Perry,*
    538 N.W.2d 24 (1995) ......................................................................................17

*Lins v. Evening News Ass'n*,
  342 N.W.2d 573 (Mich. Ct. App. 1983) ..................................................................8

*Marcone v. Penthouse Int'l Magazine for Men*,
  754 F.2d 1072 (3d Cir. 1985)..............................................................................17

*Masson v. New Yorker Magazine, Inc.*,
  501 U.S. 496 (1991)...........................................................................................15

*McCafferty v. Newsweek Media Grp., Ltd.*,
  955 F.3d 352 (3d Cir. 2020)...........................................................................18, 20

*McFarlane v. Esquire Magazine*,
  74 F.3d 1296 (D.C. Cir. 1996)..............................................................................20

*Milkovich v. Lorain Journal*,
  497 U.S. 1 (1990)..........................................................................................10, 11

*Moldea v. New York Times Co.*,
  22 F.3d 310 (D.C. Cir. 1991)................................................................................20

*Nadel v. Regents of Univ. of Cal.*,
  28 Cal. App. 4th 1251, 34 Cal. Rptr. 2d 188 (1994)..............................................17

*New York Times v. Sullivan*,
  376 U.S. 254 (1964)...........................................................................................18

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
  720 F.3d 490 (2d Cir. 2013).................................................................................12

*Park v. Capital Cities Commc'ns, Inc.*,
  181 A.D.2d 192 (N.Y. Sup. Ct. App. Div. 4th Dep't), *appeal dismissed*, 607
  N.E.2d 815 (N.Y. 1992).......................................................................................17

*Philadelphia Newspapers, Inc. v. Hepps*,
  475 U.S. 767 (1986)...................................................................................7, 10, 15

*Picard v. Am. Bd. of Fam. Med.*,
  No. 13-CV-14552, 2014 WL 1389053 (E.D. Mich. Apr. 9, 2014)............................14

*Roberts v. Auto Owners Insurance Company*,
  374 N.W.2d 905 (1985) ......................................................................................21

*Rouch v. Enquirer & News of Battle Creek Mich.*,
  487 N.W.2d 205 (Mich. 1992)..............................................................................15

*Schatz v. Republican State Leadership Committee*,
  669 F. 3d 50 (1st Cir. 2012).............................................................................18, 20

iii

*Snyder v. Phelps*,
   562 U.S. 443 (2011) ............................................................................21

*St. Amant v. Thompson*,
   390 U.S. 727 (1968) ............................................................................18

*Time, Inc. v. Pape*,
   401 U.S. 279 (1971) .......................................................................19, 20

*Waldbaum v. Fairchild Pub., Inc.*,
   627 F.2d 1287 (D.C. Cir. 1980) ..........................................................17

*Yiamouyiannis v. Consumers Union of U.S., Inc.*,
   619 F.2d 932 (2d Cir.), *cert. denied*, 449 U.S. 839 (1980) .................17

**OTHER AUTHORITIES**

Fed. R. Civ. P. 12(b)(6) ..............................................................1, 8, 9, 22

Sack, *Sack on Defamation* § 5 (5th ed. 2017) ..........................................17

iv

## I.      INTRODUCTION

No public health issue in recent memory has engendered more discussion and debate than the question of how best to respond to the threat of COVID-19, including the efficacy of masks in preventing its spread. As her Complaint indicates, Plaintiff Kristen Kelly ("Kelly") injected herself into this debate, publicly championing a position that differs from that of many public health experts and attracting both praise and criticism as a result. Defendants The Daily Beast Company LLC and Larrison Campbell (together "The Daily Beast") fulfilled the core journalistic function of reporting on this controversy. Kelly has sued them for doing so.

This type of speech—reporting on a debate on a matter of vast public interest and an individual who chose to become a high-profile voice in that debate—implicates fundamental First Amendment interests. As a result, the law places a series of very high hurdles in front of a plaintiff who brings a defamation or related tort claim based upon such an article. Kelly cannot clear any of those hurdles. It is plain from the face of her complaint that Kelly has not pled a plausible claim for defamation or intentional infliction of emotional distress and that her complaint should be dismissed immediately and in its entirety.

## II.      STATEMENT OF FACTS

This Statement of Facts is based upon the allegations of the Complaint, which for these purposes alone are assumed to be true, and the content of the article, "Meet the Anti-Mask Michigan 'Scientist' Stoking the Fourth Wave," authored by Ms. Campbell and published by The Daily Beast Company LLC (the "Article"), which is attached to the Complaint as Exhibit A and which is attached as Exhibit A here as well.

The Daily Beast respectfully encourages the Court to begin by reading the Complaint and the Article. These two documents provide essential background to this motion. As the Court will observe, the "one sided hit piece" breathlessly described in the Complaint bears no resemblance

to the actual Article. The relevant text here is the Article itself, not any party's characterization of it, but we summarize below the parts of the Article that are most salient to this motion.

The headline identifies the controversy at issue: Kelly is an "anti-mask 'scientist'" who has fallen out of favor with other scientists who think her views are "stoking the next wave" of the pandemic. The sub-headline adds: "An industrial hygienist and self-styled exposure scientist is leading the charge in her own state and nationwide against wearing masks. Experts in her state are losing it."

The Article begins by recounting an incident in which Kelly was involved that took place outside a meeting of the Hudsonville School Board. The Article describes a video, shared widely on Facebook, that shows Kelly in front of the building where the meeting will be held, complaining that she has been prohibited from attending for refusing to wear a mask. In the video, Kelly repeatedly states that she has a medically recognized disability that exempts her from the masking requirement. Her comments move back and forth between the subjects of her qualifications, her disability exemption, and her opposition to masks more generally.

The Article recounts that, at one point in the video, an individual off screen engages with her, and Kelly says: "I am actually an exposure scientist." When this draws a laugh, Kelly continues: "Yes, I'm an industrial hygienist and I actually travel around the country testifying in front of governors." She adds: "I've opened up Texas and North Dakota."

The Article then proceeds to recount The Daily Beast's own interview with Kelly. It reports that she wants to loosen up COVID restrictions in Michigan, despite an increase in cases in the state at the time of the interview. The Article reports that Kelly has "enjoyed an increasingly robust platform in anti-mask circles in recent weeks" and that this activism has prompted concern from Michigan public health officials. The Article quotes Marcia Mansary, a deputy public health

2

officer in Ottawa County, as saying that the use of masks remains "critically important."

The Article notes that Kelly obviously disagrees but adds that she comes to the issue from a perspective that differs in several respects from that of some anti-maskers who "completely dismiss the pandemic": she has "a compelling personal story"; she acknowledges certain "basic facts"; and she has "nearly two decades of experience as an industrial hygienist, a field that focuses on ways to protect employees from hazardous substances at work." The Article quotes Kelly as stating: "The science is on my side."

The Article points out, however, that "leading scientists in her field are not" and that they have expressed concerns about Kelly's activism and how she has portrayed her profession. The Article quotes Laurence Svirchev, a certified industrial hygienist with Defendant the American Industrial Hygiene Association ("AIHA"), who declares that face coverings mitigate the spread of COVID and that individuals who decline to wear them are simply "contributing to the generation of particles that are spreading around in a room."[1]

The Article then quotes Larry Sloan, the CEO of the AIHA (where, the Article reports, Kelly holds an emeritus membership), as stating that the "vast majority" of the organization's membership "believe that face coverings are one important strategy for reducing risk."[2] The Article reports Sloan's statement that Kelly's approach is "very dangerous" and Kelly's response that Sloan's statement is "shocking and disturbing."

The Article then moves to a discussion of the industrial hygiene field more generally. It

---

[1] The Daily Beast uses this statement as a pull quotation from the Article and, shortly thereafter, uses a statement made by Kelly expressing her differing opinion.

[2] The original version of the Article quoted Sloan as stating that "99%" of the organization's membership endorsed face coverings. The AIHA contacted The Daily Beast and asked that this quotation be changed, apparently because Sloan had intended the number figuratively and not literally but questions had been raised about it. As an accommodation, The Daily Beast revised the Article to use the phrase "vast majority."

3

describes how COVID transformed a "relatively obscure corner of workplace safety" into a field that is relevant everywhere. The Article notes that Kelly has capitalized on these developments "to carve out a niche for herself," and it reports her stated reasons for doing so: "Because I know. Masks don't work. It's my job."

The Article then proceeds to discuss Kelly herself more fully. It notes her numerous interviews and her advocacy in multiple states. It points out that she is not a certified industrial hygienist and also reports her response that this is a matter of "personal choice." It reports Kelly's claim to be a "senior industrial hygienist," a response by an AIHA official saying that is "not a real thing," and Kelly's rejoinder that it is. And the Article describes how Kelly joined the issue over her credentialing by addressing it in videos on TikTok, where she has 30,000 followers.

The Article also reports on questions raised regarding Kelly's work. It notes that an affidavit she submitted in support of a group in Tennessee was removed without comment from its website. The Article reports the various explanations that have been offered as to why the affidavit was withdrawn: the organization says it contained inaccuracies; Kelly maintains that she asked that it be taken down after people found her phone number in it and harassed her.

The Article reports that The Daily Beast reviewed the affidavit and did, indeed, discover some inaccuracies in how it described the studies it cited. When confronted with those inaccuracies, Kelly dismissed any concerns and responded that there are "so many studies" that support her position. The Article reports that Kelly later sent The Daily Beast links to half a dozen other studies that she says support her point of view.

The Article then proceeds to report a number of Kelly's successes as an advocate. The Article quotes a North Dakota legislator's testimonial that Kelly was "crucial" to the passage of a bill that bans mask mandates statewide. A fellow legislator is quoted describing admiringly how

4

Kelly and another Michigan "workplace safety advisor" brought "a high class of expertise," "helped spark enthusiasm," and "brought some real juice and the fuel and energy that we needed."

The Article goes on to note the "credibility" that Kelly gets from "her work history and Air Force veteran status." It describes her as "a charismatic speaker" and observes that "she often stays calm, even in a heated confrontation, but can quickly pivot to tears, as she did in her Facebook livestream outside the Hudsonville School Board meeting." It discusses her political views, noting that she has supported positions on both the left and the right and describes herself as a libertarian.

The Article reports that Kelly rejects the COVID vaccines because she doesn't want her DNA altered and doesn't want to be injected with harmful chemicals. Citing her husband as a leading expert on the issue, she says: "he doesn't understand why anyone would consent to these bio weapons." The Article points out that these objections to vaccines have been widely rejected by scientists and that Kelly concedes she is "not a doctor." And the Article notes that, according to critics, Kelly's audience is "exactly the last group" who should be hearing misinformation about vaccines. It quotes Mansaray, the Ottawa County health official, as pointing out that, while masking is important in every population, it is particularly important among people who are not and do not plan to get vaccinated.

The Article reports Kelly's response that mask mandates harm people with disabilities by forcing them out of stores, offices, and schools. It states that she told The Daily Beast that she has had a medical exemption from masking since 2013, because of a PTSD diagnosis as the result of a sexual assault. The Article reports her description of the anxiety, palpitations, and increased blood pressure that would follow from wearing a mask. But the Article also quotes her as saying that, if she medically could wear a mask, she would do so. And the Article notes that, unlike many mask mandate opponents, she does not deny the colossal worldwide COVID death toll.

5

The Article observes that Kelly has expressed ire at businesses that have refused to recognize her medical exemption. It notes that she has used the disability rights issue to further her advocacy. And it reports her plan to sue Delta Airlines for refusing to allow her to fly unmasked.

Still, the Article reports that Kelly relies on her scientific arguments against masking more often than her disability-related arguments. It describes two arguments she advances about the ineffectiveness—and even the dangers—of N95 masks. And it quotes statements in which Sloan, the CEO of the AIHA, disagrees with those arguments. Sloan is quoted in part as saying: "I don't mean to disparage her belief set—we're all entitled to our own opinions—but her testifying against the use of face covering is contrary to good public health and the science of occupational hygiene." The Article quotes Mansaray's expressions of concern as well.

The Article closes with the observation that this disagreement may not matter to those who respond favorably to Kelly's messages. It quotes a North Dakota state legislator as saying of Kelly and one of her colleagues: "They really got the crowd excited. These moms were tearing it up for liberty."

In sum, the Article discusses one of the leading public health controversies of our time. It reports on and quotes viewpoints on both sides of the issue. It cites Kelly's supporters as well as her critics. And it does not contain a single false statement of fact.

### III.    ARGUMENT

To state a claim for defamation, a plaintiff must allege facts establishing:

> (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication.

*Edwards v. Detroit News, Inc*, 910 N.W.2d 394, 400 (Mich. Ct. App. 2017) (citation omitted).

Where statements, like those at issue here, involve a matter of public concern, the plaintiff's burden of proving falsity is a constitutional requirement. *See Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776-77 (1986). Moreover, because Kelly is a limited-purpose public figure, the pleading and proof standard is even higher. She must show that The Daily Beast published the statement with "actual malice," a term of art we will discuss later. Finally, a plaintiff cannot avoid these strictures by putting a different label on her claim and calling it "intentional infliction of emotional distress," as Kelly has done here; the same hurdles apply as with a defamation claim.

Despite the strident language of the Complaint, Kelly does not take issue with the vast majority of the article. Instead, she bases her claims on the following handful of statements that she alleges appear there[3]:

- (1) "Kelly is not a scientist." (Compl. ¶ 28);

- (2) Kelly's views are "baseless." (*Id.* ¶ 28);

- (3) "Experts in [Kelly's] field are losing it." (*Id.* ¶¶ 27-28);

- (4) "99% of the AIHA's" members support face coverings." (*Id.* ¶ 32);[4]

- (5) Kelly's views are "dangerous" and undermine "the science of industrial hygiene." (*Id.* ¶ 31);

- (6) A senior industrial hygienist is "not a real thing." (¶ 43);

- (7) Kelly committed perjury. (*Id.* ¶¶ 45-46);

- (8) Kelly uses PTSD as "an act." (*Id.* ¶ 47); and

- (9) Kelly is a "tool of the right." (*Id.* ¶ 48).

---

[3] The Daily Beast will refer to the statements by these numbers hereinafter.

[4] As noted above in footnote 2, this phrase appears in the original version of the Article. In the later version, which Kelly attaches as Exhibit A to her Complaint, the phrase "vast majority" appears instead.

Every one of these statements is non-actionable: Some because they are protected matters of subjective opinion or figures of speech. Some because they are factually true. Some because Kelly has not pleaded and cannot plead facts supporting the conclusion that they were made with actual malice. And, perhaps most remarkably, some of these statements are non-actionable because The Daily Beast did not even make them, and they appear nowhere in the Article. Without an actionable statement on which to base a claim, Kelly's Complaint must be dismissed.

A.      **Courts Have Recognized That Early Dismissal of Claims Like These Provides Important First Amendment Protection.**

Baseless claims for defamation and related torts chill the exercise of First Amendment rights. Such claims compel media entities to expend resources and energies that they would otherwise direct toward constitutionally enshrined activities, like the type of public-interest reporting at issue here. As a result, courts have consistently recognized that early dismissal plays a critical role in the protection of speech. *See, e.g.*, *Kevorkian v. American Medical Ass'n*, 602 N.W.2d 233, 236 (Mich. Ct. App. 1999) ("Summary disposition is an essential tool in the protection of First Amendment rights." (citation omitted)) (reversing and directing trial court on remand to grant a motion to dismiss under the state law equivalent of Fed. R. Civ. P. 12(b)(6)); *Ireland v. Edwards*, 584 N.W.2d 632, 636 n.4 (Mich. Ct. App. 1998) ("Summary judgment is particularly appropriate at an early stage in cases where claims of libel or invasion of privacy are made against publications dealing with matters of public interest and concern." (citation omitted)); *Lins v. Evening News Ass'n*, 342 N.W.2d 573, 577 (Mich. Ct. App. 1983) (same).

It is therefore particularly important for a court to grant a motion pursuant to Fed. R. Civ. P. 12(b)(6) where the speech at issue receives the highest levels of constitutional protection and the plaintiff has failed even to state a claim.

8

**B.      The Plaintiff Must Plead a Plausible Claim.**

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal

sufficiency of the complaint. To survive a motion to dismiss, a complaint must contain more than

"labels or conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 555, 570 (2007). Nor does a complaint "suffice if it tenders

'naked assertions' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (quoting *Twombly*, 550 U.S. at 557). Rather, "[t]o survive a motion to dismiss, a complaint

must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

For multiple reasons, Kelly's Complaint fails to state a claim under this standard.

**C.      The Daily Beast Did Not Even Publish Some of the Statements of Which the Plaintiff**
**         Complains.**

The foundational element of a defamation claim is that the defendant must have actually

made the statement the plaintiff claims it made—that is, the defendant must have "published" a

false and defamatory statement of fact. In this case, the Article does not even include some of the

statements the Complaint attributes to it. In some instances, the Article even says the *exact*

*opposite.*

- Purported Statement (1) "Kelly is not a scientist." (¶ 28): The Article does not make
  this statement. To the contrary, it expressly states that Kelly has "nearly two
  decades of experience as an industrial hygienist, a field that focuses on ways to
  protect employees from hazardous substances at work."

- Purported Statement (2) Kelly's views are "baseless." (¶ 28): The Article does not

9

make this statement. To the contrary, in the context of discussing the withdrawn affidavit, the Article notes that Kelly sent The Daily Beast half-a-dozen links to studies she claims support her position.

- Purported Statement (7) Kelly committed "perjury." (¶¶ 45-46): The Article does not make this statement. To the contrary, it reports multiple explanations (including Kelly's) as to why her affidavit was withdrawn, none of which accuses her of a knowing misrepresentation.

- Purported Statement (8) Kelly uses PTSD as "part of an act." (¶ 47): The Article does not make this statement. To the contrary, it describes Kelly as a person with a disability, specifically PTSD resulting from a sexual assault.

- Purported Statement (9) Kelly is a "tool of 'the right.'" (¶ 48): Neither the Article nor anyone quoted in it makes this statement.

Thus, of the nine statements on which Kelly bases her lawsuit, the Article does not even include five of them. These non-existent statements cannot support a claim. Her claims as to the statements actually made by The Daily Beast fare no better.

## D.     All of the Statements of Which Kelly Complains Are Constitutionally Protected Opinions, Rhetorical Hyperbole, or Figurative Language.

As a matter of constitutional law, certain kinds of statements—such as subjective expressions of opinion, rhetorical hyperbole, or loose, figurative expression—cannot serve as the basis for a defamation claim. *See Greenbelt Cooperative Publ'g Ass'n v. Bresler*, 398 U.S. 6 (1970); *Milkovich v. Lorain Journal*, 497 U.S. 1 (1990); *Ireland v Edwards*, 584 N.W.2d 632, 638 (1998).

The reasoning here is straightforward. As the Court explained in *Milkovich*, under *Philadelphia Newspapers v. Hepps*, 475 U.S. 767 (1986), a plaintiff who brings a defamation claim

based upon a report on a matter of public interest must prove that the statement at issue was factually false. A plaintiff cannot do so, however, if the statement is one of subjective opinion, rhetorical hyperbole, or loose, figurative language. Those types of statements *cannot* be proved either true or false and so cannot serve as the basis for a defamation claim. *See Milkovich*, 497 U.S. at 19-20.

A recent case from the Michigan Court of Appeals provides an instructive example. In *Edwards v. Detroit News, Inc.*, 910 N.W.2d 394 (2017), the court addressed a lawsuit in which the plaintiff claimed that a newspaper column defamed him by referring to him as a "leader" of the Ku Klux Klan. The plaintiff maintained that the statement was false because he had no formal leadership role within the organization and was not even a member of it.

The court began by noting that many kinds of statements cannot serve as the basis for a defamation claim because they cannot be proved objectively true or false:

> Not all defamatory statements, even those made with actual malice, are actionable. The First Amendment protects communications that "cannot be reasonably interpreted as stating actual facts about the plaintiff," i.e., "expressions of opinion are protected" … This Court has previously identified several categories of speech that fall within the constitutionally protected class of opinion speech, including: (1) statements that are both objectively verifiable but also necessarily subjective; (2) parodies, political cartoons, satires, and other statements that, while "factual on their face and provable as false, could not reasonably be interpreted as stating actual facts about the plaintiff"; (3) "statements that both do and do not state actual facts about a person"; and (4) expressions of opinion that otherwise "constitute no more than 'rhetorical hyperbole' or 'vigorous epithet,'" such as calling someone a "crook" or "traitor" … [T]he First Amendment provides "maximum protection to public speech about public figures with a special solicitude for speech of public concern."

*Id.* at 400 (citations omitted). The court proceeded to hold that the term "leader" is inherently ambiguous and necessarily subjective. People can, and do, disagree about who qualifies as a leader. The statement at issue therefore could not be proved objectively true or false. Similarly, people

11

can, and do, disagree about masking and its efficacy as a public health strategy to combat the COVID pandemic.

Courts have been appropriately reluctant to serve as the arbiters of scientific disagreements and debates. *See ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 497 (2d Cir. 2013) ("Needless to say, courts are ill-equipped to undertake to referee [scientific] controversies."). Accordingly, "while statements about contested and contestable scientific hypotheses constitute assertions about the world that are in principle matters of verifiable 'fact,' for purposes of the First Amendment and the laws relating to fair competition and defamation, they are more closely akin to matters of opinion, and are so understood by the relevant scientific communities." *Id.*

A review of the statements of which Kelly complains reveals that all nine of them are nonactionable because they are either expressions of opinion, rhetorical hyperbole, or loose and figurative language.[5] All of them are therefore protected under this First Amendment principle for one reason or another. This is unsurprising, given that the Article explored differences in viewpoints on a highly divisive issue about which people have strong opinions.

- Purported Statement (1) "Kelly is not a scientist." (¶ 28): The Article did not make this statement, but it would have been protected opinion in any event. "Scientist," like "leader" in the *Edwards* case, has many different meanings and people can, and do, disagree about what we should consider "scientific" and who counts as a "scientist."[6]

---

[5] As set forth *supra*, most of these statements do not even appear in the Article. By addressing them here, The Daily Beast does not concede the existence of these statements but demonstrates that, even if the Article included the statements, the statements are otherwise non-actionable.

[6] For example, during a podcast interview, Donald Trump, Jr. declared that Dr. Anthony Fauci is "incompetent" and "is not a scientist." Daniel Villareal, Donald Trump Jr. Slams "Incompetent" Fauci, Claims He's "Not a Scientist," Newsweek, June 14, 2021 at

12

- Purported Statement (2) Kelly's views are "baseless." (¶ 28): The Article did not make this statement, but it would have been protected opinion in any event. People can, and do, disagree about which view of masking has a valid scientific basis or no scientific basis at all.[7]

- Statement (3) "Experts in [Kelly's] field are losing it." (¶¶ 27-28): The phrase "losing it" is a textbook example of figurative language and rhetorical hyperbole.

- Statement (4) "99% of the AIHA's" members support face coverings. (¶ 32): This statement is similarly a textbook example of rhetorical hyperbole.[8]

- Statement (5) Kelly's views are "dangerous" and undermine "the science of industrial hygiene." (¶ 31): Both sides to the debate over masking view the other side's position as dangerous and as undermining science. As the AIHA's Sloan observed in the Article: "We're all entitled to our own opinions" on this issue.

- Statement (6) A senior industrial hygienist is "not a real thing." (¶ 43): The Article

---

https://www.newsweek.com/donald-trump-jr-slams-incompetent-fauci-claims-hes-not-scientist-1600595.

[7] For example, the Centers for Disease Control maintains that "[m]asking is a critical public health tool for preventing spread of COVID-19, and it is important to remember that any mask is better than no mask." *See* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/types-of-masks.html. The Mayo Clinic holds the same position. *See* https://www.mayoclinic.org/diseases-conditions/coronavirus/in-depth/coronavirus-mask/art-20485449. Nevertheless, some high-profile figures, including Senator Rand Paul, a physician, have maintained that studies indicate masks are ineffective and have drawn criticism as a result. *See* Salvador Rizzo, "Rand Paul's false claim that masks don't work," Washington Post, December 2, 2021: https://www.washingtonpost.com/politics/2021/12/02/rand-pauls-false-claim-that-masks-dont-work/, and celebrity doctor and political candidate Mehmet Oz has publicly opposed mask mandates that he says "don't work": https://video.foxnews.com/v/6304390985001#sp=show-clips.

[8] Statements like "losing it" and "99%" are figures of speech and obviously not to be taken literally. *See Ireland v. Edwards*, 584 N.W.2d 632 (1998) (statement that a mother did not spend any time with her child was literally false but was non-actionable rhetorical hyperbole).

44135142.3

quotes the competing opinions that can and do exist on this matter. It quotes an AIHA spokesperson who says that the title is "not a real thing," and it also quotes Kelly's opposing view that it is "a real thing" that has meaning within the profession. Further, the language "a real thing" is exactly the type of loose and figurative speech that the Constitution protects from retribution.

- Purported Statement (7) Kelly committed "perjury." (¶¶ 45-46): As noted above, the Article did not include this statement. Furthermore, the statute cited by Kelly in footnote 3 of her Complaint confirms that under Michigan law a false statement made under oath qualifies as perjury only if the person made it "willfully."[9] The Article recounts the differing explanations for the withdrawal of the affidavit and leaves readers to reach their own conclusions about Kelly's intentions. If The Daily Beast had offered an opinion on the matter it would have been protected, but it did not do so.[10]

- Purported Statement (8) Kelly uses PTSD as "part of an act." (¶ 47): Again, the Article did not make this statement. Furthermore, the Article observes that in the videotape Kelly pivots from emotional calm to tears outside the Hudsonville School Board meeting. The Daily Beast did not offer an opinion about whether this was an

---

[9] As noted above, the Article does not say, or quote anyone as saying, that Kelly intentionally made false statements in her affidavit; to the contrary, the Article describes the affidavit as including mistakes.

[10] Courts have consistently held that an opinion based on disclosed facts is not actionable; underlying this doctrine is the understanding that, if the facts are disclosed, readers of the purportedly defamatory work can reach their own conclusions and opinions. *See, e.g.*, *Picard v. Am. Bd. of Fam. Med.*, No. 13-CV-14552, 2014 WL 1389053, at *12 (E.D. Mich. Apr. 9, 2014) ("If it [the opinion] is based on disclosed facts, readers can assess the facts independently and reach their own conclusions, and the writer would not be liable for defamation.").

44135142.3

act, but if it had done so, its opinion would have been protected as based on disclosed facts.

- Purported Statement (9) Kelly is a "tool of 'the right.'" (¶ 48): Neither the Article nor anyone quoted in it makes this statement, but, if they had, it would have been protected as rhetorical hyperbole, figurative language, and subjective opinion.

In sum, every statement identified in Kelly's Complaint, whether actually contained in the Article or not, is protected as an opinion, rhetorical hyperbole, or figurative language. Kelly does not hold a monopoly on the right to express opinions on this issue. The law affords others the same right to express their views that it affords to her. The Court should decline Kelly's request to declare her the winner in this international public health debate and should dismiss the Complaint in its entirety.

**E.      Kelly Has No Claim Because the Gist of the Article is True.**

A plaintiff has a defamation claim only as to statements that are materially false. *Rouch v. Enquirer & News of Battle Creek Mich.*, 487 N.W.2d 205, 214 (Mich. 1992). If the "gist" or "sting" of the defendant's statement is accurate, then the plaintiff has no claim. *Id.* A "statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991). Where, as here, the statement concerns a matter of public interest, the plaintiff must prove material falsity as a matter of constitutional law. *See Hepps*, 475 U.S. at 776-77.

The "gist" of a number of the statements of which Plaintiff complains—if not, indeed, of the entire Article—is that many scientists disagree with her position, find it indefensible, and believe that it creates significant public health risks. At a minimum, this includes Statements or Purported Statements (1) "Kelly is not a scientist." (Compl. ¶ 28); (2) Kelly's views are "baseless." (*id.* ¶ 28); (3) "Experts in [Kelly's] field are losing it." (*id.* ¶¶ 27-28); (4) "99% of the AIHA's"

15

members support face coverings. (*id.* ¶ 32); and (5) Kelly's views are "dangerous" and undermine "the science of industrial hygiene." (*id.* ¶ 31). As noted above, the Article does not even include some of these statements, and all are non-actionable expressions of opinion and rhetorical hyperbole. But even if these statements could be read as factual statements, they plainly are not false.

Kelly does not, and could not, allege in her Complaint that it is false to say that many scientists, including leaders within major public health organizations, disagree with her position on masking and view it as dangerous to public health. Quite clearly they do, and that is exactly the gist of more than half of the statements about which Kelly complains. Indeed, as the headline and sub-headline signal, it is the gist of the Article itself taken as a whole. Kelly cannot sue these individuals because they disagree with her and cannot sue The Daily Beast for reporting on their points of view.

**F.      Kelly Has Not Adequately Pled Actual Malice and Cannot Do So.**

Under the law, a plaintiff who is a "limited-purpose public figure" must prove that the defendant published the statement in question with "actual malice." Kelly clearly qualifies as a limited-purpose public figure, as the allegations of her own Complaint confirm. She has failed to plead facts that make out a plausible claim for actual malice.

A limited-purpose public figure is an individual who has voluntarily injected herself into a particular public controversy, thereby becoming a public figure with respect to a limited range of issues.  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974). Based on *Gertz*, courts apply a two-pronged analysis to determine whether a plaintiff is a limited-purpose public figure. They ask (1) whether a public controversy existed and (2) whether the plaintiff voluntarily injected herself into it. The answers here are clearly yes.

A "public controversy" is "a real dispute, the outcome of which affects the general public

or some segment of it in an appreciable way." *Waldbaum v. Fairchild Pub., Inc.*, 627 F.2d 1287, 1297 (D.C. Cir. 1980). It is "a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants." *Id.* The dispute over the efficacy of mask wearing does not just qualify as a public controversy; it stands as one of the most important and divisive public controversies of our time. Prong one is clearly satisfied.

The next question, then, is the voluntariness and extent of the plaintiff's involvement in the controversy. *See Gertz*, 418 U.S. at 345, 351. Typically, a limited-purpose public figure "actively participates in the public issue in a manner intended to obtain attention." *Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072, 1083 (3d Cir. 1985). Kelly's Complaint describes her as "a senior industrial hygienist" who has "presented testimony before legislative committees, appeared in documentaries, developed workplace training programs, and been engaged as a consultant throughout the country." (Compl. ¶ 18.) The Article recounts multiple instances in which Kelly has advocated for state legislatures to adopt anti-masking provisions—none of which Kelly denies. Indeed, the video referenced at the beginning of the article shows Kelly doing at the Hudsonville School Board meeting precisely what limited-purpose public figures do: injecting herself into a pre-existing controversy. These activities qualify her as a limited-purpose public figure.[11] *See Lakeshore Cmty. Hosp., Inc v. Perry*, 538 N.W.2d 24, 28 (1995) ("[P]laintiff has

---

[11] In his seminal treatise on defamation, Hon. Robert D. Sack lists, among dozens of examples of limited-purpose public figures, numerous individuals who spoke out on various public issues, including a chiropractor who publicly aired his views, *Cera v. Gannett Co.*, 47 A.D.2d 797 (N.Y. Sup. Ct. App. Div. 4th Dep't 1975); a physician who sought media attention for his practice and methods, *Park v. Capital Cities Commc'ns, Inc.*, 181 A.D.2d 192 (N.Y. Sup. Ct. App. Div. 4th Dep't), *appeal dismissed*, 607 N.E.2d 815 (N.Y. 1992); vocal critics of a public parks project, *Nadel v. Regents of Univ. of Cal.*, 28 Cal. App. 4th 1251, 34 Cal. Rptr. 2d 188 (1994); and a critic of water fluoridation, *Yiamouyiannis v. Consumers Union of U.S., Inc.*, 619 F.2d 932 (2d Cir.), *cert. denied*, 449 U.S. 839 (1980). *See* Sack, *Sack on Defamation* § 5 (5th ed. 2017) (collecting cases).

assumed the role of being a prominent and critical component of the health care delivery system in the community, whose presence and operation directly affect the community, and, to a lesser extent, are controlled by the village government.").

The law therefore requires Kelly to plead actual malice and to prove it at trial by clear and convincing evidence. *Twombly* and *Iqbal* make clear that she cannot successfully meet this pleading requirement by simply reciting the formulaic elements of the claim and saying: "actual malice." *See, e.g.*, *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352 (3d Cir. 2020) (granting motion to dismiss where plaintiff did not sufficiently plead facts that suggested actual malice and further ruling that plaintiff could not use discovery "to probe Newsweek's state of mind" to make such showing); *Schatz v. Republican State Leadership Committee*, 669 F. 3d 50 (1st Cir. 2012) (granting motion to dismiss where plaintiff's mere recitation of the "reckless disregard" standard constituted only "actual-malice buzzwords," not a plausible claim for relief). She must plead facts that make it plausible to conclude that The Daily Beast published the statements at issue with actual malice. This she cannot do.

"Actual malice" is a term of art with a specific legal meaning. Under the First Amendment, a public figure cannot prevail on a claim for defamation unless he or she can prove that the defendant published the statement at issue with "actual malice," which the Supreme Court has defined to mean "knowledge that [the statement] was false or with reckless disregard of whether it was false or not." *New York Times v. Sullivan*, 376 U.S. 254, 279-80 (1964); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 335-37 (1974). "Recklessness" in this context does not mean extreme negligence, but rather that "the defendant in fact entertained serious doubts as to the truth of" the statement at issue at the time of its publication. *See St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *see also Gaynes v. Allen*, 339 N.W.2d 678, 683 (Mich. Ct. App. 1983) ("In order to satisfy

the 'reckless disregard' test of actual malice, plaintiff was required to present evidence that the article was published with a high degree of awareness of probable falsity and that defendants in fact entertained serious doubts as to the truth of the matter published.").

Many defamation plaintiffs who cannot prove actual malice try an end-run around the standard by seeking to prove something else, like anger or vindictiveness. Courts have rejected these ploys, declaring, for example, that "ill will, spite, or even hatred, standing alone, do not amount to actual malice." *Ireland v. Edwards*, 584 N.W.2d 632 (Mich. Ct. App. 1998) (quoting *Grebner v. Runyon*, 347 N.W.2d 741 (Mich. Ct. App. 1984)); *see also Herbert v. Lando*, 781 F.2d 298, 308 n.6 (2d Cir. 1986) (animosity evidenced by reporter shouting "I'll get you" and "I'll destroy you" "does not in itself establish the article was false or that the editors should have known any part of it was false").

It follows logically from the definition of actual malice that a libel plaintiff cannot satisfy this standard where the defendant's statement addressed issues or circumstances open to multiple interpretations. Under such circumstances, the requisite knowledge of falsity simply cannot exist. The Supreme Court has therefore declared that as a matter of law a plaintiff cannot prove actual malice where the statement in question concerned a matter that "bristled with ambiguities." *See Time, Inc. v. Pape*, 401 U.S. 279, 290 (1971); *see also Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512-13 (1984) (with respect to an inherently ambiguous matter, a choice of interpretations—even if it reflects a misconception—"does not place the speech beyond the First Amendment's broad protective umbrella").

Thus, the Supreme Court has held that, where an event lends itself to "a number of possible rational interpretations," the "deliberate choice of [one] such . . . interpretation, though arguably reflecting a misconception, [is] not enough to create a jury issue of 'malice' under *New York*

44135142.3

*Times*." *Pape*, 401 U.S. at 289-90.  *See also Moldea v. New York Times Co.*, 22 F.3d 310, 315 (D.C. Cir. 1991) ("[W]hen a writer is evaluating or giving an account of inherently ambiguous materials or subject matter, the First Amendment requires that the courts allow latitude for interpretation."); *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1305 (D.C. Cir. 1996) (holding that, given "the inherent difficulties in verifying or refuting a claim that someone is the agent of a foreign power," a reasonable jury could not find the defendant acted with actual malice); *Dannis v. C & G Publ'g, Inc.*, 468 N.W.2d 331, 332 (Mich. Ct. App. 1991) ("The United States Supreme Court has held that adoption of any rational interpretation of a public document is a sufficient defense, as a matter of law, to a suit for defamation." (citing *Pape*)).

In her Complaint, Kelly briefly refers to the "actual malice" standard in passing (Compl. ¶¶ 24-25), but she offers no facts to support the accusation. Instead, the Complaint is peppered with accusations that the Article was "character assassination" (*id.* ¶ 15), a "hit piece" (*id.* ¶¶ 22, 23, 51), "drip[ping] with malice and contempt" (¶ 41), and so on. Her "allegations" of actual malice therefore fail as a matter of law for three independent reasons: First, they do not go beyond the sort of formulaic recitations rejected as insufficient by *Twombly* and *Iqbal*. Second, the type of "malice" they describe does not constitute "actual malice" as the law specifically defines it. *See, e.g.*, *McCafferty*, *supra*; *Schatz*, *supra*. And, finally, they relate to a public debate that "bristles with ambiguities" and differences in opinion and interpretation.[12]

---

[12] Kelly's Complaint includes a count for libel *per se*. This is a meaningless addition. As noted in *Edwards*, *supra*, to state a claim for defamation, a plaintiff must plead, among other things, "either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication." *Edwards*, 910 N.W.2d at 400 (citation omitted). This element reflects the common law principle that a libel plaintiff must do one of two things: plead that they suffered special harm or show that the statement fell into a category where monetary injury could be presumed. Libel *per se* is therefore not a separate tort, but a way of pleading the tort of libel where the statement falls into a particular category. This count, accordingly, changes nothing in the preceding analysis and adds nothing to Kelly's Complaint.

**G.      Kelly's Intentional Infliction of Emotional Distress Claim Is Subject to Dismissal.**

Kelly's claim for intentional infliction of emotional distress also fails, for three independently sufficient reasons.

First, Kelly may not use this tort to circumvent defenses to her failed defamation claim. This is precisely why, in an analogous context, the Supreme Court has held that claims for intentional infliction of emotional distress that are essentially relabeled defamation claims are subject to the same defenses. *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1985) (intentional infliction of emotional distress claim governed by First Amendment libel law actual malice requirement).

Second, the Supreme Court has made clear that "outrageousness," the standard applicable to a claim for intentional infliction of emotional distress, is too vague to be applied to speech on matters of public interest. *See Snyder v. Phelps*, 562 U.S. 443 (2011). There, the Court held that "outrageousness … is a highly malleable standard with 'an inherent subjectiveness about it which would allow a jury to impose liability on the basis of the jurors' tastes or views, or perhaps on the basis of their dislike of a particular expression." *Id.* at 459.  It is worth noting that the speech in *Snyder* was particularly odious: It consisted of picketing with hateful signs by the Westboro Baptist Church at a memorial service for Matthew Snyder, who had died while serving in the military. The Court acknowledged that the signs contributed to the already immeasurable grief of Matthew's father but held that the First Amendment did not allow for the punishment of public interest speech on the basis of its "outrageousness."

Finally, the Michigan Supreme Court has made unmistakably clear that this tort is reserved for extreme and shocking situations. Thus, in *Roberts v. Auto Owners Insurance Company*, 374 N.W.2d 905, 908-09 (1985), the Court held that the tort requires "conduct that has been so outrageous in character and so extreme in degree as to be beyond all possible bounds of decency

21

and to be regarded as atrocious and utterly intolerable in a civilized society." The Article at issue here reported on a critical and ongoing public debate over a matter of tremendous importance. Discussion of such matters is what civilized societies engage in, not what they punish.

**IV.    CONCLUSION**

For all of the reasons set forth above, The Daily Beast respectfully requests that Court dismiss the Complaint in its entirety and with prejudice pursuant to Fed. R. Civ. P. 12(b)(6).

Respectfully submitted,

HONIGMAN LLP
*Attorneys for Defendants The Daily Beast Company LLC and Larrison Campbell*

By: */s/ Andrew M. Pauwels*
J. Michael Huget (P39150)
Leonard M. Niehoff (P36695)
Andrew M. Pauwels (P79167)
Honigman LLP
315 East Eisenhower Parkway Suite 100
Ann Arbor, MI 48108-3330
(734) 418-4254
mhuget@honigman.com
lniehoff@honigman.com
apauwels@honigman.com

Dated: June 7, 2022

22

## <u>CERTIFICATE OF COMPLIANCE WITH L.R. 7.3(b)(ii)</u>

Pursuant to Local Rule 7.3(b)(ii), Counsel for Defendants The Daily Beast Company LLC and Larrison Campbell certifies that this brief contains 7,153 words, as indicated by Microsoft Word 2016, inclusive of any headings, footnotes, citations, and quotations, and exclusive of the caption, cover sheets, tables of contents, signature block, any certificate, and any accompanying documents.

Dated: June 7, 2022                              */s/ Andrew M. Pauwels*

44135142.3

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 7, 2022, a true and correct copy of the foregoing was filed via the Court's CM/ECF system and served via electronic filing upon all counsel of record in this case, with a courtesy copy via email and U.S. Mail to counsel for Plaintiff who has not yet appeared in this matter.

Dated: June 7, 2022                     */s/ Andrew M. Pauwels*