UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KRISTEN MEGHAN KELLY,

    Plaintiff,

v.

THE DAILY BEAST COMPANY LLC, et al.,

    Defendants.

_____/

Case No. 1:22-cv-482

Hon. Hala Y. Jarbou

## **OPINION**

In this diversity action, Plaintiff Kristen Meghan Kelly sues an online news website, The Daily Beast Company LLC, and its writer, Larrison Campbell, for alleged harm stemming from an article written by Campbell about Kelly. The other defendant is the American Industrial Hygiene Association ("AIHA"). Before the Court is Defendants Campbell and The Daily Beast's motion to dismiss the complaint against them (ECF No. 7). For the reasons herein, the Court will grant Defendants' motion.[1]

### **I. BACKGROUND**

According to Kelly's complaint, she is a "senior industrial hygienist" with over 19 years of experience in "developing, analyzing and implementing workplace health and safety protocols." (Compl. ¶ 18, ECF No. 1-2.) She has "presented testimony before legislative committees, appeared in documentaries, . . . and been engaged as a consultant throughout the country regarding workplace health and safety issues." (*Id.*) Among other things, she opposes "mask mandates," i.e., government and private sector requirements to wear masks as a means to mitigate the spread

---

[1] Defendant AIHA filed a "concurrence" in the motion by the other defendants (ECF No. 11); apparently, AIHA also seeks dismissal of the claims against it. That concurrence is not sufficient to put Kelly on notice of AIHA's grounds for dismissal. It is not a motion. And it is not obvious that the same reasons for dismissal would apply to AIHA.

of COVID-19. In April 2021, she appeared at a school board meeting in Hudsonville, Michigan, to express her opposition to its mask mandate. (*Id.* ¶ 21.) She created a video of her attendance at the meeting and then posted the video online.

**A. The Daily Beast's Article**

Kelly's video caught the attention of Campbell, who contacted Kelly and discussed it with her. The Daily Beast later published Campbell's article about Kelly, which is titled, "Meet the Anti-Mask Michigan 'Scientist' Stoking the Fourth Wave."[2] (Article, ECF No. 1-2, PageID.26.)

The Daily Beast's article (the "Article") first describes an interaction depicted in Kelly's video that occurred between Kelly and another parent at the school board meeting. The other parent apparently laughed at Kelly's claim that she is an "exposure scientist." (*Id.*, PageID.27.) Kelly responded, "'Yes, I'm an industrial hygienist, and I actually travel around the country testifying in front of governors. I've opened up Texas and North Dakota. . . . Because I know. Masks don't work. Because it's my job. It's my job[.] . . . And do you want to know who does want to hear my opinion? Attorneys, who I help with their cases.'" (*Id.*, PageID.27, 32.)

The Article asserts that "Kelly has enjoyed an increasingly robust platform in anti-mask circles" and that public officials fear her activism could cause problems in Michigan. (*Id.*, PageID.28.) The Article quotes a deputy public health officer in Ottawa County as stating that "Mask use continues to be critically important right now. It's proven to be effective and it's proven to be safe." (*Id.*, PageID.29.)

---

[2] The subtitle of the article is:

> An industrial hygienist and self-styled exposure scientist is leading the charge in her own state and nationwide against wearing masks. Experts in her field are losing it.

(ECF No. 1-2, PageID.26.)

2

The Article describes Kelly as "unlike most conservative anti-maskers" because she has a "compelling personal story" that includes "nearly two decades of experience as an industrial hygienist, a field that focuses on ways to protect employees from hazardous substances at work." (*Id.*)  It then contrasts Kelly's assertion that "science" is "on [her] side" with the opinion of Laurence Svirchev, a certified industrial hygienist with the AIHA, who is quoted as saying that "Face coverings are a proper public health measure that mitigates the transmission of SARS-CoV-2." (*Id.*, PageID.29-30.)  The Article also quotes the CEO of the AIHA, Larry Sloan, as telling The Daily Beast that "99 percent of the AIHA's 800 members believe that face coverings are one important strategy for reducing risk" and that Kelly's activism is "very dangerous" and is "undermining the science of industrial hygiene." (Compl. ¶ 31.)[3]  The Article reports that Kelly responded to Sloan's statement, calling it "shocking and disturbing" and asserting that "it goes against the whole field of industrial hygiene." (Article, PageID.31.)

The Article contends that Kelly has "capitalized" on her expertise. (*Id.*, PageID.32.)  She had been "interviewed dozens of times in conservative media" and she told The Daily Beast that she "either testified or submitted sworn affidavits about the dangers of masking in four states." (*Id.*, PageID.33.)  In addition, she has a TikTok account with nearly 30,000 followers, where she boasted about "testify[ing] in front of a state Caucus and meet[ing] with their Governor to relay facts hidden by the MSM." (*Id.*, PageID.34.)  In fact, Kelly had recently testified in support of a bill banning mask mandates in North Dakota.  "The bill's sponsor told The Daily Beast that Kelly's participation was 'crucial' to the bill's eventual passage." (*Id.*, PageID.36.)

---

[3] The Daily Beast later modified Sloan's statement to say that "the vast majority" of AIHA's members believe that face coverings are important, rather than "99 percent."

But the Article questions Kelly's expertise, noting that she is not a "certified" industrial hygienist, which she claimed was a "personal choice." (*Id.*, PageID.33.) Instead, she holds bachelor's and master's degrees in occupational safety and refers to herself as a "senior" industrial hygienist, which Sue Marchese, a managing director at AIHA, reportedly told the Daily Beast "is not a real thing." (*Id.*) However, Kelly responded that "senior status means you've got senior status over other industrial hygienists or you've been in the career field a certain amount of time." (*Id.*)

The Article contends that Kelly's expertise "doesn't always hold up." (*Id.*, PageID.34.) For instance, an affidavit that she submitted to Tennessee Stands, a group that "fights against COVID restrictions," "quietly disappeared" from the group's website. (*Id.*) A representative of the group told The Daily Beast that it removed Kelly's affidavit "after inaccuracies came to [its] attention." (*Id.*) But Kelly told The Daily Beast that she asked the group to remove the affidavit because it contained her phone number and she had received harassing calls and texts. (*Id.*)

Examining Kelly's affidavit, the Article notes that she gave the wrong title to a study in a medical journal, claiming that it concluded that coronavirus particles will pass through a N95 mask, when in fact the study does not mention face coverings at all. (*Id.*, PageID.35.) Her affidavit also cited studies to bolster her argument that "masking doesn't work," but "many of those studies were either inconclusive or outdated or suggested the opposite." (*Id.*) When asked about these discrepancies, Kelly "brushed them off," telling The Daily Beast that she would "go look at it" because she "can't remember." (*Id.*) She contended that "so many studies" supported her view, and later sent The Daily Beast "links to half a dozen other studies that she said support not masking." (*Id.*)

4

According to the Article, Sloan also told The Daily Beast that Kelly was "taking specific studies and extracting a narrative that is perhaps aligned with her belief set." (*Id.*, PageID.42.) He opined that "her testifying against the use of face covering is contrary to good public health and the science of occupational hygiene[.]" (*Id.*)

The Article also discusses Kelly's argument that masking harms people with disabilities "by forcing people like her out of stores, offices and schools[.]" (*Id.*, PageID.39.) Kelly told the Daily Beast that "medically," she "can't wear a mask." (*Id.*) She has a "medical exemption from masking" due to post-traumatic stress disorder; wearing a mask causes her "anxiety and a range of circulatory issues[.]" (*Id.*)

The Article asserts that Kelly is "well-positioned to be a darling of late pandemic anti-mask brigade" because of her work history and because she is a "charismatic speaker who casually ties topics like disability rights and health freedom into a single argument." (*Id.*, PageID.36.) Also, she "stays calm, even in a heated confrontation, but can quickly pivot to tears when the context calls for it, as she did [in her video outside the school board meeting.]" (*Id.*)

Accompanying the Article are two photos of Kelly next to the caption "Black Sheep." (*Id.*, PageID.26.)

### B. Kelly's Claims

Kelly's complaint asserts the following claims: defamation, defamation per se, and intentional infliction of emotional distress. Defendants Campbell and The Daily Beast argue that Kelly's complaint fails to state a claim against them.

## II. DISMISSAL STANDARD

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a

complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The Court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

Assessment of the complaint under Rule 12(b)(6) must ordinarily be undertaken without resort to matters outside the pleadings; otherwise, the motion must be treated as one for summary judgment under Rule 56. *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010). "However, a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

### III. ANALYSIS

**A. Defamation**

A defamation claim under Michigan law has the following four elements:

"(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication."

6

*Smith v. Anonymous Joint Enter.*, 793 N.W.2d 533, 540 (Mich. 2010) (quoting *Mitan v. Campbell*, 706 N.W.2d 420, 421 (Mich. 2005)). "The elements of [a] defamation claim 'must be specifically pleaded, including the allegations with respect to the defamatory words, the connection between the plaintiff and the defamatory words, and the publication of the alleged defamatory words.'" *Ryniewicz v. Clarivate Analytics*, 803 F. App'x 858, 867 (6th Cir. 2020) (quoting *Gonyea v. Motor Parts Fed. Credit Union*, 480 N.W.2d 297, 299 (Mich. Ct. App. 1991)). "'[M]ost importantly, a plaintiff must identify the precise materially false statement published.'" *Id.* (quoting *Rouch v. Enquirer & News of Battle Creek Mich.*, 487 N.W.2d 205, 220 (Mich. 1992) (Riley, J., concurring)).

### 1. Actual Malice

Where the plaintiff is a public official, there is an additional requirement. The plaintiff can prevail only "if he or she establishes that the alleged defamatory statements were made with 'actual malice.'" *Id.* "'Actual malice' exists when the defendant knowingly makes a false statement or makes a false statement in reckless disregard of the truth." *Id.* at 540-41. To meet this standard, the plaintiff must demonstrate "'more than a departure from reasonably prudent conduct.'" *Id.* at 541 (quoting *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989)). The evidence must "justify a conclusion that the defendant made the allegedly defamatory publication with a 'high degree of awareness' of the publication's probable falsity, or that the defendant 'entertained serious doubts as to the truth' of the publication made." *Id.* at 541-42 (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)). "[W]hen a defendant has reported a third party's allegations, reckless disregard for the truth of the allegations 'may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.'" *Id.* at 542 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).

7

The actual malice requirement also applies to a "limited-purpose public figure," i.e., "a person who has thrust himself or herself to the forefront of a particular public controversy in order to influence the resolution of the issues involved." *Redmond v. Heller*, 957 N.W.2d 357, 372 n.11 (Mich. Ct. App. 2020). Here, Defendants argue that Kelly was a limited-purpose public figure who must show actual malice to succeed on her defamation claim.

There is a "'two-pronged analysis to determine if a plaintiff is a [limited-purpose] public figure.'" *Thomas M. Cooley Law School v. Kurzon Strauss, LLP*, 759 F.3d 522, 529 (6th Cir. 2014) (quoting *Clark v. ABC, Inc.*, 684 F.2d 1208, 1218 (6th Cir. 1982)). "'First, a 'public controversy' must exist.'" *Id.* (quoting *Clark*, 684 F.2d at 1218). "'Second, the nature and extent of the individual's involvement in the controversy must be ascertained[,]' so that the court can determine whether the plaintiff voluntarily injected [her]self into the particular public controversy giving rise to the alleged defamation." *Id.* (quoting *Clark*, 684 F.2d at 1218).

The first prong, the existence of a public controversy, requires "'a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way.'" *Id.* (quoting *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1296 (D.C. Cir. 1980)). "It is 'a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants.'" *Id.* at 529-30 (quoting *Waldbaum*, 627 F.2d at 1296). "[T]he court must isolate the specific public controversy related to the defamatory remarks.'" *Id.* at 530 (quoting *World Wide Ass'n of Specialty Programs v. Pure, Inc.*, 450 F.3d 1132, 1137 (10th Cir. 2006)).

The first prong is easily met here. The necessity for mask mandates, and the related question of whether masks are effective or appropriate for controlling the spread of COVID-19, were, and continue to be, public controversies. That dispute has received widespread public attention. Indeed, as Kelly's own complaint suggests, those issues were the subject of fierce debate

at school board meetings, state legislatures, and many other settings. Also, the ramifications of that dispute have been felt by those who were not direct participants in it. Large segments of the population have been required to wear a mask as a condition for work, public transport, or the use of indoor public spaces.

For the second prong, the nature and extent of Kelly's participation in the controversy, the Court considers three "factors": "'first, the extent to which participation in the controversy is voluntary; second, the extent to which there is access to channels of effective communication in order to counteract false statements; and third, the prominence of the role played in the public controversy.'" *Id.* (quoting *Clark*, 684 F.2d at 1218).[4]

The second prong is also satisfied here. First, there is no question that Kelly voluntarily injected herself into the public controversy regarding mask mandates. In addition to her appearance at a school board meeting, she alleges that she has testified before state legislatures, she posted a video of her advocacy on social media, and she has appeared in documentaries, ostensibly for the purpose of promoting her views about mask mandates.[5]

Second, Kelly has had at least some access to channels of communication to counteract false statements. In addition to her public testimony and appearances, her video was distributed widely enough to catch the attention of a news reporter. The Article also notes that Kelly "has been interviewed dozens of times in conservative media" (Article, PageID.33), an assertion that Kelly does not challenge in her complaint or in her briefing. Also, the Article notes that she has

---

[4] These factors were first laid out in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 343-45 (1974).

[5] The complaint does not identify the documentaries, but a Google search reveals that Kelly has appeared in a documentary series by InfoWars called "Covidland," which purports to "expose[] the official COVID-19 narrative." *See* Kristen Meghan Kelly – IMDB, https://m.imdb.com/title/tt15426894/fullcredits/cast?ref_=m_ttfc_3.

9

thousands of followers on TikTok, a social media platform.[6]  And the Article indicates that Campbell gave Kelly an opportunity to respond to some of the statements about her in the Article itself.  On other hand, it does not appear that Kelly has had "'regular and continuing access to the media that is one of the accouterments of having become a public figure.'"  *Clark*, 684 F.3d at 1219 (quoting *Hutchinson v. Proxmire*, 443 U.S. 111, 136 (1979)).  This does not appear to be a case where "the press has . . . clamored to interview her."  *See id.* (citing *Street v. Nat'l Broadcasting Co.*, 645 F.2d 1227, 1234 (6th Cir. 1981)).  Accordingly, this factor only slightly favors a finding that Kelly is a limited-purpose public figure.

Third, by testifying in front of state legislators, one of whom apparently characterized Kelly's support as "crucial" to passage of a bill banning mask-mandates, Kelly assumed a position of some prominence in the controversy.[7]  Thus, on the whole, the relevant facts demonstrate that Kelly voluntarily thrust herself into a place of public prominence in the controversy for the purpose of influencing the outcome.  By doing so, she "invite[d] attention and comment" and "voluntarily exposed [herself] to increased risk of injury from defamatory falsehood[.]"  *Gertz*, 418 U.S. at 345.  Consequently, her defamation claim requires that she show actual malice by Defendants.

Kelly contends that the real controversy at issue in her defamation claim is the Article's "attack" on her qualifications and its assertions about the affidavit that she posted.  She argues that she is not a public figure because *those* particular issues are not public controversies.  However, her involvement in the public controversy over mask mandates has invited attention and comment on her credentials, claims, and expertise.  Furthermore, she has used her specialized knowledge

---

[6] In addition, she has a YouTube channel that states it has over 8,000 subscribers.  *See* https://www.youtube.com/@RealDealMediaTV/.

[7] Similarly, Kelly asserted in a media interview that she has "travel[ed] around the country . . . testifying in front of legislative bodies, helping to open up states like North Dakota, Texas, New Hampshire, and Florida[.]"  Russia Today (RT) Interview, https://www.youtube.com/watch?v=9Cd4xHTPMnE&t=194s.

10

and qualifications as the basis for her public advocacy. Thus, Defendants' statements on those topics fall within the public figure rule.

Kelly also argues that she has not assumed a position of public prominence. She contends that she is no different from those who use social media or who appear before legislative hearings, school board meetings, and other public forums. But most such individuals are not like Kelly. They do not travel around the country for the purpose of influencing policy makers in multiple states, sit for interviews with the media to advocate for their position, or receive public credit for their advocacy work by state legislators. In other words, they do not put themselves in the position of public prominence and influence that Kelly has assumed here.

As discussed in more detail below, Kelly fails to allege facts from which to infer actual malice. Much of her complaint focuses on the tone of the Article, though as she acknowledges, actual malice is not established "merely through a showing of ill will or 'malice' in the ordinary sense of the term." *Harte-Hanks Commc'ns*, 491 U.S. at 667. Those factors might be relevant as circumstantial evidence of actual malice, but they are not sufficient to establish it on their own. *Id.* at 667-68.

In an attempt to show actual malice, Kelly refers to an email from Stephen Petty, an industrial hygienist, to Sloan. In the email, Petty claimed the following:

> I spoke with[] and sent the author [of the Article] materials I have been using in presentations to groups of 350+ and on national radio shows over the past two month[s] just before the publication of this article. Both my remarks and presentation were ignored by this author. I only contacted this person as Kelly, a disable[d] veteran and long time [industrial hygienist] asked me to do[ ]so given my credentials in major litigation on the topic of exposure and PPE. I figured this was a hit piece, but tried to step in without success. I believe my presentation is an accurate reflection of the science; but I am open to comment and criticism[.]

(4/27/2021 Petty Email to Sloan, ECF No. 1-2, PageID.45.) However, Kelly provides no further details regarding the materials that Petty sent to Sloan. Nor does Kelly explain how those materials

11

are relevant to any of the challenged statements in the Article. Thus, Petty's email does not provide any basis for making a plausible inference that Defendants acted with reckless disregard for the truth.

In another effort to show actual malice, Kelly alleges that, before she filed her lawsuit, she "gave notice to [Defendants] to publish retractions and Defendants were allowed a reasonable time to do so. No retractions have been published." (Compl. ¶ 50.) Kelly argues that an unwillingness to retract known false statements is indicative of malice, citing *Golden Bear Distrib. Sys. of Tex., Inc. v. Chase Revel, Inc.*, 708 F.2d 944, 950 (5th Cir. 1983) ("'Under certain circumstances evidence [of a refusal by a publisher to retract a statement after it has been demonstrated to him to be both false and defamatory] . . . might be relevant in showing recklessness at the time the statement was published.'" (quoting Restatement of Torts (Second) § 580A)). But that principle does not aid Kelly here. Kelly does not allege that she demonstrated to Defendants that any statements in the Article were both false and defamatory. Instead, she vaguely alleges that she gave "notice" to Defendants, without describing the contents of her notice. Without sufficient allegations regarding actual malice, Kelly fails to state a defamation claim.

### 2. Matter of Public Concern / Media Defendant

Where "a media defendant is involved," "a statement on matters of public concern must be provable as false before there can be liability under state defamation law." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20 (1990). "[T]he First Amendment [protects] 'statements that cannot be reasonably interpreted as stating actual facts about an individual,'" including "statements employing 'loose, figurative, or hyperbolic language which would negate the impression that the writer was seriously maintaining' an assertion of fact." *Seaton v. Trip Advisor LLC*, 728 F.3d 592, 597 (6th Cir. 2013) (quoting *Milkovich*, 497 U.S. at 20-21).

Defendants The Daily Beast and Campbell are media defendants, and the Article discusses matters of public concern. Accordingly, the statements challenged by Kelly must be provable as false.

### 3. Challenged Statements / Claims

Kelly's complaint does not clearly set forth each of the allegedly false statements that she is challenging. But in her response brief, she identifies the following false "claims" in the Article that are the basis for her defamation suit: (1) Kelly is "anti-mask"; (2) Kelly is "stoking the fourth wave of COVID"; (3) Kelly is not a scientist; (4) Kelly is "leading the charge in her own state and nationwide against wearing masks"; (5) "experts in her field are losing it" in response to Kelly's advocacy; (6) "leading scientists" in Kelly's field are "not on her side"; (7) "99% of AIHA's members believe that face coverings are one important strategy for reducing [COVID] risk"; (8) Kelly's activism is "very dangerous" and is "undermining the science of industrial hygiene"; (9) Kelly is not a "senior industrial hygienist"; (10) Kelly's affidavit was removed from the Tennessee Stands website "after inaccuracies came to their attention"; (11) Kelly submitted false information in her affidavit. (Pl.'s Resp. Br. 13-14, ECF No. 12.)  For reasons discussed below, none of these statements/claims give rise to a defamation claim against Defendants.

*(1) Kelly is anti-mask.*  The Article's headline refers to Kelly as an "anti-mask" Michigan scientist. In context, this is not a false statement of fact. "Anti-mask" is simply a shorthand reference to Kelly's opposition to mask mandates. Indeed, Kelly makes a similar assertion about The Daily Beast, saying that it has a "pro-mask, pro-vaccine agenda." (Compl. ¶ 14.)

*(2) Kelly is stoking the fourth wave of COVID.*  This assertion is not provable as false. It is rhetorical hyperbole that cannot serve as the basis for a defamation claim against Defendants.

*(3) Kelly is not a scientist.*  The Article does not make or imply this assertion.

13

*(4) Kelly is leading the charge in her own state and nationwide against wearing masks.* Kelly does not allege or indicate what is false about this assertion, which simply refers to her prominence in advocating against mask mandates.

*(5) Experts in Kelly's field are losing it.* It is not clear why Kelly believes this statement is false. It is another example of rhetorical hyperbole, referring to the fact that other industrial hygienists disagree with her advocacy. It is not an actionable statement.

*(6) Leading scientists are not on Kelly's side.* Kelly does not indicate why she thinks this statement is false.

*(7) 99% of AIHA's members believe that face coverings are one important strategy for reducing [COVID] risk.* This statement says very little about Kelly. At most, it implies that she disagrees with most AIHA members on whether mask-wearing is an "important" strategy, which is an inherently subjective issue that is open to debate.

Furthermore, the statement is not actionable because the "99%" language is Sloan's estimate about the high degree of support among AIHA members for the proposition asserted. There are no facts from which to infer that Defendants recklessly disregarded the truth when reporting this statement. Kelly does not allege facts suggesting that Defendants had serious reason to doubt the veracity of the statement. Indeed, Kelly herself does not identify why the statement is false.

Kelly notes that, in an email attached to the complaint, Sloan told another person, "When I read the article I winced when I saw that quote. That is not what [sic] said, and we have notified the editor accordingly." (Sloan Email, ECF No. 1-2, PageID.47.) The Daily Beast subsequently changed the Article to say that the "vast majority" of AIHA's members "believe that face coverings are one important strategy for reducing risk." (*See* Article, ECF No. 1-2, PageID.31.) However,

14

Kelly attributes any falsehood in the statement to *Sloan*; she alleges that "Sloan [k]new his statements were false when he made them to Campbell." (Compl. ¶ 37.) Yet there are no facts from which to infer that Campbell or The Daily Beast had reason to know of any falsehood in what Sloan told them. Thus, Kelly has not alleged actual malice by Defendants in connection with that statement.

*(8) Kelly's activism is very dangerous and is undermining the science of industrial hygiene.* Here, Defendants were reporting the opinion of Sloan about his perception of the impact of Kelly's activism. They were not making provably false statements of fact about that activism.

*(9) Kelly is not a senior industrial hygienist.* The Article did not make this assertion. Instead, it reported the opinion of one person who purportedly said that a senior industrial hygienist is "not a real thing." It also reported Kelly's reasons why she believes that the term has meaning in her profession. In doing so, Defendants did not make a false statement of fact. Indeed, the assertion that Kelly's job title "is not a real thing" is clearly a subjective opinion expressed in loose, rhetorical terms. It is not an assertion that is provable as false.

*(10) Kelly's affidavit was removed from the Tennessee Stands website after inaccuracies came to its attention.* Kelly objects to this statement because she asked Tennessee Stands to remove the affidavit due to concerns that it contained her personal information. However, Defendants reported her account in the Article. Notably, Kelly does not challenge the substance of Defendants' statement, which is that Tennessee Stands *told* The Daily Beast that it learned of inaccuracies in her affidavit before it removed the affidavit from its website. Indeed, it is possible to reconcile that statement with Kelly's account. In other words, both can be true at the same time: Kelly asked Tennessee Stands to remove the affidavit and Tennessee Stands learned about

inaccuracies in that affidavit before it did so. Thus, Kelly has not adequately alleged a false statement.

Moreover, Kelly does not allege facts sufficient to establish actual malice by Defendants. To the contrary, the Article purports to identify several inaccuracies in the affidavit, undermining any contention that Defendants recklessly disregarded the truth.

Kelly compares this situation to other circumstances where a court could find there was a reckless disregard for the truth, including: reliance on an "unverified anonymous telephone call"; publishing statements that are "inherently improbable"; or publishing statements by an informant where there were "obvious reasons to doubt the veracity of the informant." *See St. Amant*, 390 U.S. at 732. None of those circumstances are present here. The Article cited an unnamed source, not an anonymous one, and it verified the information provided by identifying several inaccuracies in the affidavit and then giving Kelly an opportunity to respond. Apparently, she did not refute those inaccuracies when responding to Defendants and she does not do so here. Also, the inaccuracies in the affidavit and the discovery of them by Tennessee Stands were not "inherently improbable." Finally, Kelly provides no facts that would suggest there were obvious reasons for Defendants to doubt the truth of the information received from Tennessee Stands. As indicated, the statement from Tennessee Stands did not directly contradict with Kelly's account.

*(11) Kelly submitted false information in the affidavit.* The Article did not make this statement, but it did purport to identify inaccuracies in the affidavit. However, Kelly does not explain how any statements in the Article about the contents of the affidavit are false. Instead, she simply makes a conclusory assertion in the complaint that "[t]here were no inaccuracies in the affidavit." (Compl. ¶ 46.) The Court need not accept this conclusory assertion as true. *See Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 846 (6th Cir. 2012) (The Court "must accept

16

non-conclusory allegations of fact in the complaint as true and determine if the plaintiff has stated a plausible claim for relief."); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (noting that "'naked assertion[s]' devoid of 'further factual enhancement'" are not sufficient to state a claim (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007))). Thus, for all the foregoing reasons, Kelly has not alleged an actionable false statement of fact by Defendants, or one that is accompanied by actual malice.

### B. Defamation Per Se

The second count of Kelly's complaint asserts a claim of defamation per se. Some defamatory statements do not require proof of injury. For instance, "words charging the commission of a crime are defamatory per se, and hence, injury to the reputation of the person defamed is presumed to the extent that the failure to prove damages is not a ground for dismissal." *Burden v. Elias Bros. Big Boy Rests.*, 613 N.W.2d 378, 381 (Mich. Ct. App. 2000). Here, Kelly argues that Defendants effectively accused her of the crime of perjury when stating that she submitted an affidavit that contained inaccuracies.

Kelly acknowledges that the Article does not expressly accuse her of perjury, i.e., willfully making false statements in her affidavit. Nevertheless, she contends that a reader could interpret the Article as making such an assertion. According to Kelly, Michigan courts look to the effect of statements on a reader, i.e., the "sting" of a statement, to determine whether a statement is defamatory. She contends that the "sting" of the Article is that she committed perjury. But this claim fails for the same reason as her defamation claim regarding inaccuracies in the affidavit. She does not plead facts indicating that Defendants made false statements or acted with actual malice when discussing the contents of her affidavit.

Moreover, Kelly misapplies the law. To the extent Kelly relies on a theory of defamation by implication, she does not state a claim against Defendants. A claim for defamation by

17

implication relies on "defamatory *implications* [that] are materially false"; "such a cause of action might succeed even without a direct showing of any actual literally false *statements*." *Hawkins*, 583 N.W.2d at 732 (emphasis in original). However, "Michigan prohibits libel liability for true speech on matters of public concern. Liability may not be imposed on a media defendant for facts about public affairs it publishes accurately and without material omissions." *Nichols*, 477 F.3d at 402 (quoting *Royal Palace Homes, Inc. v. Channel 7 of Detroit, Inc.*, 495 N.W.2d 392, 394 (Mich. Ct. App. 1992)). Thus, Defendants are "'not responsible for every defamatory implication a reader might draw from [their] report of true facts, absent evidence [they] intended the defamatory implication.'" *Id.* (quoting *Royal Palace Homes*, 495 N.W.2d at 396). Put another way,

> a [media] defamation defendant cannot be held liable for the reader's possible inferences, speculations, or conclusions, where the defendant has not made or directly implied any provably false factual assertion, and has not, by selective omission of crucial relevant facts, misleadingly conveyed any false factual implication.

*Id.* (quoting *Locricchio v. Evening News Ass'n*, 476 N.W.2d 112, 139 (Mich. 1991)).

Here, Kelly alleges no facts indicating that Defendants made any provably false assertions of fact or selectively omitted any crucial relevant facts. And as to the affidavit, there are no facts indicating that Defendants intended to imply that Kelly committed perjury. Thus, for all the foregoing reasons, Kelly fails to state a defamation claim against Defendants.

### C. Intentional Infliction of Emotional Distress

Kelly's last claim against Defendants is one for intentional infliction of emotional distress ("IIED"). Where a plaintiff's claim of IIED is premised on the same statements as a defamation claim, the IIED claim is subject to the same First Amendment limitations as the defamation claim. *See Ireland v. Edwards*, 584 N.W.2d 632, 641 (Mich. Ct. App. 1998) (citing *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988)). In other words, the "statements must be provable as false, [the] statements must be understandable as stating actual facts about the plaintiff, and, in the case

18

of public-official or public-figure plaintiffs, the plaintiffs must prove actual malice by clear and convincing evidence[.]" *Id.* Here, Kelly's allegations in support of her defamation claim cannot survive the First Amendment limitations on them. For similar reasons, her allegations are not adequate to state an IIED claim against Defendants.

## IV. CONCLUSION

For the reasons stated, Kelly does not state a claim against Defendants Campbell and The Daily Beast. Consequently, the Court will grant their motion and dismiss the claims against them.

The Court will enter an order that is consistent with this Opinion.

Dated:   12/9/2022                               /s/ Hala Y. Jarbou
                                                 HALA Y. JARBOU
                                                 CHIEF UNITED STATES DISTRICT JUDGE